UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NO. 17-20401 |
| Plaintiff, | HON. BERNARD A. FRIEDMAN |
| v. | |
| | VIOLATIONS: |
| D-1  DR. DAVID JANKOWSKI | 21 U.S.C. §§ 841(a)(1) and 846 |
| D-2  HASSAN HAMDAN, | 18 U.S.C. § 1349 |
| Defendants. | FILED USDC - CLRK DET<br>2019 SEP 24 PM3:40 |

## SECOND SUPERSEDING INDICTMENT

**THE GRAND JURY CHARGES:**

### GENERAL ALLEGATIONS

Beginning on or about January 2011, a scheme and pattern of illegal conduct involving the unlawful distribution of prescription drug controlled substances and fraudulent health care billings was formed. The defendants, Dr. DAVID JANKOWSKI, HASSAN HAMDAN, and others, both known and unknown to the grand jury, played different roles and engaged in different aspects of the overall scheme.

At all times relevant to the Indictment, Defendant, Dr. DAVID

JANKOWSKI, was a physician licensed to practice medicine in the State of Michigan. At all times relevant to the indictment, Dr. JANKOWSKI held a valid DEA license, permitting him to prescribe certain controlled substances within the course of professional medical practice and for legitimate medical necessity. At all times relevant to the Indictment, Dr. JANKOWSKI also held a DEA license permitting him to dispense certain controlled substance.

Defendant HASSAN HAMDAN is an unlicensed medical school graduate, who is not legally authorized to prescribe controlled substances.

Dr. JANKOWSKI is a physician-enrollee in Medicare, and, as such, was subject to Medicare rules and regulations.

Dr. JANKKOWSKI organized and operated purported medical practices and visiting clinic. The entities were listed as Summit Medical Group, Summit Physicians Group, and Summit Visiting Physicians. A fundamental purpose of these entities was to write prescriptions for controlled substances that could be filled and dispensed from Dr. DAVID JANKOWSKI's in-house dispensary or various pharmacies. The purpose of filling the controlled substance prescriptions was not for the legitimate treatment of patients, but rather to obtain controlled substances that could be sold at a substantial profit on the illegal street market.

The primary prescription drug controlled substances illegally prescribed and distributed were Roxicodone (oxycodone HCl), hydrocodone, alprazolam (Xanax),

and carisoprodol (Soma).

At various times Dr. DAVID JANKOWSKI employed different doctors, including L.L., J.W., S.M., and J.B., physician's assistants including H.R., nurse practitioners, including E.S., and an unlicensed graduate of medical school, defendant HASSAN HAMDAN. The doctors, physician assistants and nurse practitioners, employed by Dr. JANKOWSKI generated income by writing controlled substance prescriptions or by completing controlled substance prescriptions which had been pre-signed by Dr. JANKOWSKI utilizing his DEA number. The prescriptions were issued after either a cursory examination by the prescribing employee or without any examination at all by the prescribing employee.

At times HASSAN HAMDAN, would pose as a doctor and conduct the limited examinations and issue controlled substances prescriptions from pre-signed prescriptions provided by Dr. JANKOWSKI. HASSAN HAMDAN would examine patients in the clinic as well as in their homes. Dr. JANKOWSKI would sign the chart and the prescriptions as if he had actually examined the patient.

During the conspiracy, it was the role of A.B., A.M., and other unindicted coconspirators to serve as patient recruiters or marketers who recruited Medicare beneficiaries or Auto Insurance beneficiaries to become nominee or "straw" patients to be seen by Dr. JANKOWSKI, HASSAN HAMDAN, or other employees of the practice. After a cursory examination or no examination at all, the controlled

substance prescriptions would be provided to the purported patient, who, after filling the prescription, would give a portion of the prescription, or cash, to the recruiter as compensation for taking the purported patient to the doctor. Once filled at Dr. JANKOWSKI's in-house dispensary or at a pharmacy, the pills were distributed for profit by the recruiters.

At other times during the scheme, patient names would simply be provided to the defendant, Dr. JANKOWSKI, and in exchange for cash payments, he would write the controlled substance prescriptions without actually examining any purported patients at all.

The "doctor visit" and various unnecessary medical tests or procedures, which may or may not have been performed, would be billed to Medicare or Auto Insurance Companies. Billing for a more expensive procedure than the one actually conducted, referred to as "upcoding," also took place. The top procedure codes billed by defendant Dr. JANKOWSKI, and others, to Medicare included P-Stims, office visits and injections.

In addition, both the controlled substances and non-controlled "maintenance" medications would be billed to health care benefit programs by the pharmacies or the defendant's in-house dispensary. This "maintenance medication" was used in order to make the doctor's prescribing practices appear more legitimate by reducing the percentage of controlled substance prescriptions.

Billings to the Medicare program for medically unnecessary patient services during the time frame of this conspiracy exceeded $17 million. Additionally, billings to the Medicare program for prescription medications filled during the timeframe of this conspiracy exceeded $5 million.

During the timeframe of the conspiracy, more than 45,000 prescriptions for controlled substances were issued under Dr. JANKOWSKI's DEA number. In particular, defendant JANKOWSKI prescribed more than 1.3 million unit dosages of Schedule II controlled substances and more than 400,000 unit dosages of schedule III controlled substances. Dr. JANKOWSKI and HASSAN HAMDAN knowingly prescribed prescription drug controlled substances outside the course of legitimate medical practice and for no legitimate medical purpose, in furtherance of the scheme.

These general allegations are adopted and incorporated in each count of this second superseding indictment.

## COUNT ONE

(21 U.S.C. §§ 841(a)(1), 846- Conspiracy to Distribute and
Possess with Intent to Distribute Controlled Substances)

D-1 Dr. DAVID JANKOWSKI
D-2 HASSAN HAMDAN

That beginning on or about January, 2011, and continuing until on or about June 2017, in the Eastern District of Michigan, Southern Division, and elsewhere, the defendants, Dr. DAVID JANKOWSKI and HASSAN HAMDAN, did

5

knowingly, intentionally and unlawfully combine, conspire, confederate and agree with other persons not named in this Third Superseding Indictment, to commit offenses against the United States, that is, to knowingly, intentionally and unlawfully distribute and possess with intent to distribute controlled substances, including but not limited to, the Schedule II drugs Roxicodone (Oxycodone HCl) and Hydrocodone, the Schedule III drugs Hydrocodone bitartrate/acetaminophen; the Schedule IV drug Alprazolam (Xanax); and the Schedule IV drug Carisoprodol (Soma). These prescription drug controlled substances were distributed outside the course of usual medical practice and for no legitimate medical purpose, all in violation of Title 21, United States Code, Sections 846, 841(a)(1).

## COUNT TWO

(18 U.S.C. § 1349- Conspiracy to Commit Health Care Fraud)

D-1 Dr. DAVID JANKOWSKI
D-2 HASSAN HAMDAN

From in or about January, 2011, and continuing until on or about June 2017, the exact dates being unknown to the grand jury, in the Eastern District of Michigan, Southern Division, the defendants, Dr. DAVID JANKOWSKI and HASSAN HAMDAN, and others known and unknown to the grand jury, did willfully and knowingly combine, conspire, confederate and agree to violate Title 18, United States Code, Section 1347, that is, to execute a scheme and artifice to defraud a

health care benefit program, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services.

It was the purpose of the scheme for the defendants to unlawfully enrich themselves by, among other things, (a) submitting false and fraudulent claims to Medicare; (b) concealing the submission of false and fraudulent claims to Medicare and the receipt and transfer of the proceeds from the fraud; and (c) diverting proceeds of the fraud for the personal use and benefit of the defendants.

### The Health Insurance Program

The Medicare Program (Medicare) is the federal healthcare program for the aged and disabled established by Congress in 1965, as Title XVIII of the Social Security Act and codified at 42 U.S.C. § 1395. Medicare is administered through the Centers for Medicare and Medicaid Services (CMS). CMS is a division of the United States Department of Health and Human Services. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries." Medicare is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

Medicare includes coverage under four primary components, hospital

insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C) and prescription drug benefits (Part D).

Medicare Part A also covers physical therapy, occupational therapy, and skilled nursing services if a facility was certified by CMS as meeting certain requirements. Part B of the Medicare Program covers the cost of physicians, services and other ancillary services not covered by Part A.

Medicare Part D provides prescription drug coverage to persons who are eligible for Medicare. Under the program, eligible Medicare beneficiaries may enroll in a Medicare Prescription Drug Plan that adds prescription drug coverage to traditional Medicare. Alternatively, Medicare eligible beneficiaries may obtain prescription drug coverage by enrolling in a Medicare Advantage Plan under Part C of the Medicare program. Such Medicare Advantage Plans provide the full range of Medicare coverage to enrollees, including a prescription drug benefit under Medicare Part D.

By becoming a participating provider in Medicare Part B, enrolled providers agree to abide by the policies and procedures, rules, and regulations governing reimbursement. In order to receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies and procedures, rules, and regulations, issued by

CMS and its authorized agents and contractors.

Upon certification, the medical provider, whether a clinic or an individual, is assigned a provider identification number for billing purposes (referred to as a PIN). When the medical provider renders a service, the provider submits a claim for reimbursement to the Medicare contractor/carrier that includes the PIN assigned to that medical provider. When an individual medical provider is associated with a clinic, Medicare Part B required that the individual provider number associated with the clinic be placed on the claim submitted to the Medicare contractor.

Health care providers were given and/or provided with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations. Providers can only submit claims to Medicare for services they rendered and providers must maintain patient records to verify that the services were provided as described on the claim. The basic requirement for any claim to be payable by Medicare is that the service must be "reasonable and necessary for the diagnosis or treatment of illness or injury." What is "reasonable and necessary" for certain conditions is defined based upon accepted practices in the medical community, as further defined by National Coverage Determinations

issued by CMS and Local Coverage Determinations issued by the Medicare administrative contractor for the State of Michigan.

On May 25, 2017, Dr. DAVID JANKOWSKI filed an 855I form with CMS revalidating his provider enrollment in Medicare with Summit Medical Group. On the 855I, Dr. DAVID JANKOWSKI signed the certification statement indicating that he agreed, among other things, to abide by the Medicare laws, regulations, and program instructions, and that he understood that payment of Medicare claims is conditioned upon the claim and underlying transaction complying with such laws, regulations, and program instructions. By signing the certification statement, Dr. DAVID JANKOWSKI also agreed that he would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and would not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

A Medicare enrollment application was completed and accepted for Summit Medical Group, Summit Physicians Group, and Summit Visiting Physicians. As a result, Dr. JANKOWSKI obtained a Medicare provider number and became eligible to bill the federal Medicare program for purportedly rendering various medical services through these entities.

Dr. JANKOWSKI, HASSAN HAMDAN, and others billed Medicare and caused Medicare to be billed for medical services that were medically unnecessary,

such as trigger point injections, P-Stems, and manipulations of the spine. These services were not provided by Dr. JANKOWSKI despite the fact that the claims submitted to Medicare represented that Dr. JANKOWSKI had provided the services.

In furtherance of the conspiracy, Dr. JANKOWSKI would certify patients to receive home healthcare services from Summit Visiting Physicians that were medically unnecessary. Dr. JANKOWSKI would provide HAMDAN and others pre-signed home health forms and pre-signed prescriptions. HAMDAN and others would complete the home health forms, certifying patients to receive such services without any medical evaluation by Dr. JANKOWSKI. Dr. JANKOWSKI would then bill Medicare, through Summit Visiting Physicians, for these home health care visits and falsely represent that he had seen and evaluated the patients.

All in violation of Title 18, United States Code, Section 1349.

## **COUNTS THREE – THIRTY TWO**

(21 U.S.C. §§ 841(a)(1)- Unlawful Distribution of Controlled Substances )

D-1 Dr. DAVID JANKOWSKI

On or about each of the dates set forth below, defendant, Dr. DAVID JANKOWSKI did knowingly, intentionally, and unlawfully distribute the following prescription drug controlled substances. Dr. DAVID JANKOWSKI committed these offenses by writing, authorizing or pre-signing prescriptions for controlled substances for no legitimate medical purpose, and transferring the

prescriptions so they could be filled, in the names of individuals as follows:

| Count | On or About Date | Patient | Controlled Substance | Quantity | Controlled Substance Schedule |
|---|---|---|---|---|---|
| 3 | 7/2/2012 | H.F. | Hydrocodone BIT/Acetaminophen 10mg | 120 | III |
| 4 | 7/2/2012 | H.F. | Carisoprodal 350 mg | 90 | IV |
| 5 | 7/2/2012 | H.F. | Alprazolam 2mg | 60 | IV |
| 6 | 7/2/2012 | H.F. | Adderall 30 mg | 30 | II |
| 7 | 8/2/2012 | H.F. | Hydrocodone BIT/Acetaminophen 10mg | 120 | III |
| 8 | 8/2/2012 | H.F. | Carisoprodal 350 mg | 90 | IV |
| 9 | 8/2/2012 | H.F. | Alprazolam 2mg | 60 | IV |
| 10 | 8/2/2012 | H.F. | Adderall 30mg | 30 | II |
| 11 | 9/6/2012 | H.F. | Hydrocodone BIT/Acetaminophen 10mg | 120 | III |
| 12 | 9/6/2012 | H.F. | Carisoprodal 350 mg | 90 | IV |
| 13 | 9/6/2012 | H.F. | Alprazolam 2mg | 60 | IV |
| 14 | 9/6/2012 | H.F. | Adderall 30 mg | 30 | II |
| 15 | 12/18/2014 | H.B. | Hydrocodone (Norco 10 mg.) | 60 | II |
| 16 | 2/16/2015 | H.B. | Hydrocodone (Norco 10 mg.) | 90 | II |
| 17 | 8/20/2015 | J.A. | Oxycodone 30 mg | 60 | II |
| 18 | 8/20/2015 | J.A. | Oxymorphone 15mg | 30 | II |
| 19 | 8/20/2015 | J.A. | Alprazolam 2mg | 30 | IV |
| 20 | 9/21/2015 | J.A. | Oxycodone 30 mg | 60 | II |
| 21 | 9/21/2015 | J.A. | Oxymorphone 15 mg | 30 | II |
| 22 | 9/21/2015 | J.A. | Alprazolam 2mg | 30 | IV |
| 23 | 10/26/2015 | H.B. | Hydrocodone (Norco 10 mg.) | 90 | II |
| 24 | 10/26/2015 | H.B. | Morphine (30 mg) | 30 | II |

| Count | On or About Date | Patient | Controlled Substance | Quantity | Controlled Substance Schedule |
|---|---|---|---|---|---|
| 25 | 11/24/2015 | J.A. | Oxycodone 30 mg. | 30 | II |
| 26 | 11/24/2015 | J.A. | Oxymorphone 15 mg. | 30 | II |
| 27 | 11/24/2015 | J.A. | Alprazolam 2 mg. | 30 | IV |
| 28 | 1/19/2016 | H.B. | Hydrocodone (Norco 10 mg.) | 90 | II |
| 29 | 1/19/2016 | H.B. | Morphine (30 mg.) | 30 | II |
| 30 | 2/23/2016 | J.A. | Oxycodone HCL 30 mg | 90 | II |
| 31 | 2/23/2016 | J.A. | Oxymorphone 15 mg | 30 | II |
| 32 | 2/23/2016 | J.A. | Alprazolam 2mg | 30 | IV |

All in violation of Title 21, United States Code, Section 841(a)(1).

## COUNTS THIRTY-THREE – FORTY-SIX

(18 U.S.C. § 1347- Health Care Fraud)

D-1 Dr. DAVID JANKOWSKI

On or about the dates specified as to each count below, in the Eastern District of Michigan, Southern Division, the defendant, Dr. DAVID JANKOWSKI, in connection with the delivery of a payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody

and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services.

It was the purpose of the scheme for the defendant to unlawfully enrich himself by, among other things, (a) submitting false and fraudulent claims to Medicare, for prescription medication, physician office visits, and other services; (b) concealing the submission of false and fraudulent claims to Medicare and the receipt and transfer of the proceeds from the fraud; and (c) diverting proceeds of the fraud for the personal use and benefit of the defendant.

| Count | On or About Date | Patient | CPT Code | Description of Procedure | Amount Billed |
|---|---|---|---|---|---|
| 33 | 12/18/2014 | H.B. | 99213 | Established Patient Office Visit | $250.00 |
| 34 | 2/16/2015 | H.B. | 99213 | Established Patient Office Visit | $250.00 |
| 35 | 2/16/2015 | H.B. | J1885 | Injection Beneath the Skin | $80.00 |
| 36 | 2/16/2015 | H.B. | 96372 | Injection, Ketorolac, Tromethamine, per 15 mg. | $90.00 |
| 37 | 2/16/2015 | H.B. | 98926 | Osteopathic Manipulative | $160.00 |
| 38 | 8/20/2015 | J.A. | 99213 | Established Patient Visit | $250.00 |
| 39 | 9/21/2015 | J.A. | 99213 | Established Patient Visit | $250.00 |

| Count | On or About Date | Patient | CPT Code | Description of Procedure | Amount Billed |
|---|---|---|---|---|---|
| 40 | 10/26/2015 | H.B. | 99213 | Established Patient Visit | $250.00 |
| 41 | 11/24/2015 | J.A. | 99213 | Established Patient Visit | $250.00 |
| 42 | 11/24/2015 | J.A. | 98926 | Osteopathic Manipulative | $160.00 |
| 43 | 1/19/2016 | H.B. | 99213 | Established Patient Visit | $250.00 |
| 44 | 1/19/2016 | H.B. | G0479 | Drug Screen | $650.00 |
| 45 | 2/23/2016 | J.A. | 99213 | Established Patient Visit | $250.00 |
| 46 | 2/23/2016 | J.A. | 98926 | Osteopathic Manipulation | $160.00 |

All in violation of Title 18, United States Code, Section 1347.

## FORFEITURE ALLEGATIONS

**(21 U.S.C. §853, 18 U.S.C. § 981(a)(1)(C), 982(a), 28 U.S.C. §2461 - Criminal Forfeiture)**

The allegations contained in this Second Superseding Indictment above are incorporated by reference as if set forth fully herein for the purpose of alleging forfeiture pursuant to the provisions of Title 21, United States Code, Section 853 and Title 18, United States Code, Section 982(a)(7).

Upon conviction of the conduct alleged in Counts One and Two of the Second Superseding Indictment, the defendant shall forfeit to the United States any property, constituting or derived from, any proceeds obtained, directly or indirectly as a result of such violations pursuant to Title 21, United States Code, Section 853.

Upon conviction of the conduct alleged in Count One, the defendant shall forfeit any property used or intended to be used, in any manner, to facilitate the commission of such violations pursuant to Title 21, United States Code, Section 853.

Upon conviction of the conduct alleged in Count Two, the defendant shall forfeit to the United States any property, real or personal, constituting, or derived from, any gross proceeds obtained, directly or indirectly, as a result of such violations pursuant to Title 18, United States Code, Section 982(a)(7).

Substitute Assets: If the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

    i. Cannot be located upon the exercise of due diligence;

    ii. Has been transferred or sold to, or deposited with, a third party;

    iii. Has been placed beyond the jurisdiction of the Court;

    iv. Has been substantially diminished in value; or

    v. Has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) to seek to forfeit any other property of defendant up to the value of the above-described property subject to forfeiture.

THIS IS A TRUE BILL

s/GRAND JURY FOREPERSON

MATTHEW SCHNEIDER
United States Attorney

s/WAYNE F. PRATT
Chief, Health Care Fraud Unit

s/REGINA R. McCULLOUGH
Assistant United States Attorney
211 W. Fort St., Ste. 2001
Detroit, MI 48226
Phone: (313) 226-9618
Email: regina.mccullough@usdoj.gov

s/PHILIP A. ROSS
Assistant United States Attorney
211 W. Fort St., Ste. 2001
Detroit, MI 48226
Phone: (313) 226-9790
Email: philip.ross@usdoj.gov

Dated:   September 24, 2019

**ORIGINAL**

| United States District Court<br>Eastern District of Michigan | Criminal Case Cover Sheet | Case Number<br>17-CR-20401 |
|---|---|---|

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.

| Companion Case Information | Companion Case Number: |
|---|---|
| This may be a companion case based upon LCrR 57.10 (b)(4)[1]: | Judge Assigned: |
| ☐ Yes    ☒ No | AUSA's Initials: *RRM* |

Case Title: USA v. JANKOWSKI, et al.

County where offense occurred: WAYNE

FILED USDC - CLRK DET
2019 SEP 24 PM 3:40

Check One:    ☒ Felony        ☐ Misdemeanor        ☐ Petty

___ Indictment/___ Information --- no prior complaint.
___ Indictment/___ Information --- based upon prior complaint [Case number:                    ]
 ✓  Indictment/___ Information --- based upon LCrR 57.10 (d) *[Complete Superseding section below]*.

## Superseding Case Information

Superseding to Case No: 17-CR-20401              Judge: BERNARD A. FRIEDMAN

☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☒ Embraces same subject matter but adds the additional defendants or charges below:

| Defendant name | Charges | Prior Complaint (if applicable) |
|---|---|---|
| COUNTS THREE THROUGH FORTEEN<br>COUNT FIFTEEN | 21 U.S.C. §841(a)(1)-<br>Unlawful Distribution of<br>Controlled Substances<br>18 U.S.C. §1349- | |

Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.

~~March 21, 2018~~ 9/24/19
Date

REGINA R. MCCULLOUGH
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226-3277
Phone: (313) 226-9618
Fax:    (313) 226-2621
E-Mail address: regina.mccullough@usdoj.gov
Attorney Bar #: P64936

---

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.