United States District Court
Eastern District of Michigan
Southern Division

United States of America,                    17-cr-20401

                Plaintiff                    Hon. Bernard A. Friedman

v.

David Jankowski, D.O.,

                Defendant.

---

## Government's Sentencing Memorandum

---

The United States respectfully moves this Court to sentence David Jankowski to 300 months' imprisonment following his conviction on 30 of 32 counts for drug-trafficking and health care fraud. The brief below addresses the pertinent provisions of the Sentencing Reform Act of 1984.

### I.   **Sentencing Reform Act Factors**

18 U.S.C. § 3553(a) provides the relevant objectives and factors to be considered by sentencing courts when determining a "sentence sufficient, but not greater than necessary." Those objectives are: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for a sentence to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation and rehabilitation); (3) the kinds of sentences legally available; (4)

the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need for restitution.

    *a.  Nature of Jankowski's Offenses*

The jury convicted Jankowski of leading long-running drug and health care fraud conspiracies at three different practices located in Dearborn Heights and Southfield, Michigan. A common theme emerged throughout the trial testimony: David Jankowski treated drug-seeking individuals as mere pawns in his game of three card monte where he prescribed potentially lethal combinations of controlled substances. He used the drugs to lubricate his scheme to defraud Medicare and No-Fault auto insurance companies. His own viscous text messages stand in stark contrast to the portrait of a caring doctor painted by Paula Jankowski, a nurse anesthetist and the woman perpetually at his side.

Jankowski contented himself with shoddy practices, using his prescription pad to facilitate drug-trafficking, and inducing at least one, drug-seeking patient to undergo unnecessary shoulder surgery in exchange for Oxy, Xanax, Soma, and Adderall prescriptions. He had no qualms about prescribing hydrocodone to a pregnant woman. His own expert witness acknowledged – albeit reluctantly – that

Jankowski's prescription of Xanax to pregnant patient N.M. was "strongly discouraged." (ECF No. 169, Nabity Cross-Examination, PgID. 1787).

Jankowksi supplied narcotics to the self-professed "largest pill dealer in Warrendale who people were shooting over." (ECF No. 174, Testimony of A.B., PgID 2512). The price of admission for A.B., however, was to undergo medically unnecessary shoulder surgery. (*Id.* at 2516). A.B. described how Jankowski coached him in the scheme:

> He told me to use my right shoulder as an injury of point, and he told me to say that I had whiplash and that it was causing me headaches, and if I took MRIs they wouldn't be able to prove that I had -- didn't have headaches or if I did have headaches. There was no way of proving them. And if I had old injuries on my body, they would show on the MRIs, and we could use that to say that it happened during the accident. (*Id.*)

Jankowski told A.B. what to say in order to obtain the unnecessary shoulder surgery used as a ruse. Once A.B. underwent shoulder surgery, performed by a doctor with extensive financial ties to Jankowksi, a fact apparently unbeknownst to A.B., Jankowski kept prescribing opioids to A.B. Presumably, if A.B. had shoulder surgery, his pain levels would improve. But, with Jankowski, A.B., hit a gold mine

with his shoulder surgery. He found a DEA licensee willing to write prescriptions for anything.

i.   *Jankowski's Biography: An Idyllic Childhood Surrounded By Loving Family, Enviable Resources in a Stunningly Beautiful City*

Jankowski, a 63-year-old man, grew up in Grosse Pointe, Michigan where he graduated from a local high school. Then, he pursued higher education ultimately obtaining an osteopathic degree. (PSR ¶ 84). He subsequently completed a residency followed by a fellowship in anesthesiology and cardiac anesthesia and pain. He ultimately returned to Michigan ostensibly to practice medicine. (PSR ¶ 86). He claims to have held numerous professional memberships and appointments in societies related to his profession. (PSR ¶ 88). He reported receiving a Fellowship in in Cardiac Anesthesia. He reported being a Diplomat of the American Board of Anesthesia. He claims to be a Certified Physicians' Trainer of Peripheral Stimulator (P-STIM), the efficacy of which remains disputed[1], and obtaining a certification in stem cell injections. (¶ 88).

By his own account, he has "fond memories" of his childhood where he was raised by a local homebuilder, a man who rose from an orphanage to achieve the

---

[1] https://www.medpagetoday.com/special-reports/exclusives/95898: "Despite uncertainty about the benefits of auricular electroacupuncture, providers across the country are still using it -- and have allegedly defrauded the federal government out of millions of dollars. Some investigators say the false claims cases around P-Stim devices are an example of a scheme to profit from expensive therapies and exploit federal healthcare programs."

American dream, and his stay-at-home mother. His financially-stable parents were actively involved in his life and raised him in a home free of abuse. They regularly attended the Catholic Church (PSR ¶ 62). He continues to enjoy a strong relationship with his wife, his children, his ninety-three-year-old mother, and his two siblings. (PSR. ¶¶ 63-64). He reports being an active parent who coached his sons' hockey teams and funded their college educations. (PSR. ¶ 66).

ii.   *Privileged Son of Grosse Pointe Turned Drug-Trafficking Fraudster*

To residents of Dearborn Heights, Southfield, and the surrounding communities, however, David Jankowski was a drug kingpin who financed his schemes through fraud. The jury saw text messages where Jankowski referred to his own office as shit show. Another case-in-point: He called Nancy Faraj to testify on his behalf and to attack the credibility of a key government witness, A.B. He made this decision to call Nancy Faraj after he learned that federal agents had in their possession of video of Nancy Faraj dancing A.B.'s brother's grave. She cackled while taunting A.B. saying that she could still talk to her brother [in federal prison] and that "my brother has an out date." Jankowski was not deterred despite knowing that Nancy Faraj forfeited a substantial sum of drug cash after federal prosecutors accused her a civil forfeiture suit of laundering money for her

brother's – separate and distinct – violent-drug trafficking organization.[2] Nancy Faraj fantastically denied being the link between Jankowski and A.B. though patient files seized from Jankowski's office corroborate A.B. story that he went to Jankowski with Mohamad Faraj at Nancy Faraj's suggestion. She, herself, is no is no slouch when it comes to suing auto insurance companies. Wayne County Circuit Court records reflect that she has filed four individual lawsuits against various auto-insurance companies.

Jankowski propped up his preposterous defense with this woman, Nancy Faraj, other women who willingly assisted his schemes. He'd have the public believe him to be a paragon of virtue from Grosse Pointe who lives in Bingham Farms home, owns a $3 million South Haven home on Lake Michigan's blue waters, and a condominium in Florida. But, the only thing separating David Jankowski from the retinue of heroin and fentanyl dealers who cycle through this courthouse are his lab coat and DEA license.

Jankowski office worker, Seena Alsiyaghy, was another woman whose reputation for truth was shredded after she reluctantly admitted on cross-examination that she received prescriptions for Norco without Jankowski ever examining her. (ECF No. 170, Alsiyaghy Cross-Examination PgID. 1882-84).

---

[2] https://www.mlive.com/news/detroit/2015/10/brothers_sentenced_in_detroit.html; "Brothers sentenced in Detroit drug operation that used teenagers to deal pills. DETROIT, MI -- Mohamed Faraj, convicted of leading the operation, was sentenced in June to 24 years in prison." (Steeh, J.).

Confronted by her own patient file displayed for the jury on the overhead screen, Alsiyaghy had nowhere to turn – kind of like the desperate folks whose opioid addictions have been fed over the years by Jankowski. She was forced to admit that she herself was involved in corrupt practices.

     *iii.*    *Jankowski's Own Expert Admitted He Failed Minimal Standards of Care*

       Isolating the most brazen aspect of Jankowski's criminal enterprise is no small feat but as to the health care fraud angle, his use of Hassan Hamdan, an unlicensed medical provider, to bilk Medicare for Physician Home Visits stands as the starkest of example of Jankowski's unfettered duplicity. Jankowski's own opinion witness, Thomas Nabity, admitted under-cross examination that Jankowski's use of unlicensed individual to provide physician home visits was improper. (ECF No. 169 Nabity Cross-Examination, PgID 1781). Nabity, who is board certified in physical medicine and employed at Michigan Neurology Associates[3], admitted that Jankowski's arrangement was patently wrong and obvious "to everybody." (*Id*. at 1782).

     *iv.*    *Open Secret Among Employees that Jankowski Used Uncredentialed Hamdan To Perpetuate Fraud Scheme*

       Hassan Zabaibah, a Jankowski medical assistant, testified that he primarily went on home visits with Hassan Hamdan. (R. 155, Zabaibah Testimony, PgID

---

[3] https://www.michiganneurologyassociates.com/provider/thomas-s-nabity-md. Jankowski notes in his PSR objections that another Michigan Neurology Physician was part of Jankowski's Summit Physician's Group which was one organization housing his schemes.

887). Zabaibah knew Hamdan because they both worked together at visiting physician practice operated by Hicham Elhorr, prior to working for Jankowski. Like Jankowski, Elhorr used unlicensed medical providers to provide physician home visits that he billed to Medicare. (R. 158, Sentencing Mem. 13-cr-20158). Zabaibah testified that Hamdan provided rudimentary physical exams lasting two to three minutes before providing the patient with controlled substance prescriptions that Jankowski pre-signed. (*Id*. at 889). Rita Miles, another medical assistant, who also worked for Elhorr prior to working for Jankowski, testified that Hamdan and Zabaibah generally saw patients in their homes more regularly than Jankowski saw patients in their homes. (R. 165, Miles Testimony, PgID 1434, 1438-39). She also testified that mid-level practitioners also saw patients through Jankowski's medical practice. Both Allie Gallovich's testimony as well as a letter from Jankowski's office manager, Angela Morales, letter illustrates that the services Jankowski claimed to have personally provided were, in fact, either provided by the unlicensed-Hamdan.

Hamdan pleaded guilty acknowledging that he was, in fact, guilty as charged. (R. 144, Hamdan Rule 11, PgId 748-749). He testified that he was an unlicensed foreign medical graduate who could not practice medicine, prescribe drugs or bill insurance companies. (Hassan Hamdan, R. 165: Tr. Trans., PgId. 1488-89). Dr. Jankowski knew his unlicensed status (*Id*.). Nonetheless, Dr.

Jankowski hired him to practice medicine without a license (*Id*., 1490-92). Hamdan saw patients without Dr. Jankowski, used blank prescriptions pre-signed by Jankowski to give them controlled substances. Jankowski caused the patient visits were billed as if Dr. Jankowski personally performed the service. (*Id*., 1493- 1501). Hamdan was instructed not to sign the patient chart. When Dr. Jankowski later signed the chart, it would falsely appear that Dr. Jankowski saw the patient (Id., 1497-98).

> v. *Jankowski Submits Fraudulent Claims for Services Actually Provided By Mid-Level Medical Providers*

The evidence also reflects that Jankowski submitted false and fraudulent Medicare claims for services in his offices but provided either by the unlicensed-Hamdan or by other mid-level practitioners. Jankowski's Southfield manager texted him asking "are you coming in to see patients or just to sign." (Trial Exhibit 125 (page 47), Jankowski Texts). Had the services been billed under Medicare's "incident to" criteria, Jankowski would have received smaller reimbursements. Coleman also messaged Jankowski about "coming to sign for Bitkowski" which refers to a mid-level provider who was excluded from billing Medicare while he was employed by Jankowski. Coleman wrote:

> Coleman: …I need to know what to do about our schedule for Friday and Monday. Jason [Bitkowksi] can't see Medicare patients.

> Jankowski: I'm here to sign on Friday.

Coleman: We'll he (an apparent reference to Bitkowski) can't "bill"

Coleman: Excellent

Jankowski: So do all Medicare (Trial Exhibit 125, Jankowski Texts, November 2, 2016).

vi.   *Jankowski Relied On Unlicensed Hamdan Inside Clinic Too*

Jankowski also used Hamdan to see patients Summit Medical Group, and Summit Physicians Group. Four employee witnesses verified that Hamdan treated patients without Dr. Jankowski. (A.H., May 3, 2022 TR at 14, 16-17: Hamdan was a visiting doctor, he saw patients without Dr. Jankowski 80% of the time; Hassan Zabiabah, (ECF No. 155, Tr. Trans., PgID., 883-84, 887-88, 924-25); Zabiabah was an MA who "primarily" went on visits with Hamdan, who was not licensed. Hamdan used pre-signed prescriptions for controlled substances, Dr. Jankowski was not present according to A.F. (ECF No. 155: Tr. Trans., PgID 967, 975, 986: Hamdan saw patients at both clinics. When Dr. Jankowski was not present, the practitioners would still see patients. (ECF No. 165: R.M. Tr. Trans, PgID. 1437-38, 1441-42, 1445, 1447, 1450-51. Though Hamdan lacked a license, he worked at both the visiting and pain clinics. The daily routine would be for just Hamdan and Zabiabah to see patients, not Dr. Jankowski. Miles saw Hamdan examine patients. Hamdan used Jankowski's pre-signed scripts. If Dr. Jankowski was not present or out of town, the patients would still be seen. Dr. Jankowski

10

signed the patient charts after the visits, and the visits were fraudulently billed to Medicare as if Dr. Jankowski himself treated the patient.

vii.   *Medicare Would Not Have Reimbursed Services By Hamdan If They Knew He Lacked License*

A registered nursed employed by Medicare's Unified Program Integrity Coordinator, Covent Bridge, testified that Medicare would not have paid for visits provided by an unlicensed provider like Hamdan. A nurse tasked with investigating fraud testified that Medicare would not have paid for claims if it had known that the services were purported rendered by an unlicensed provider, like Hamdan, rather than by Jankowski. (R. 160, Tr. Trans, PgId 1201-1202). The agreement that Hamdan would see patients without Dr. Jankowski and create a patient chart, and Jankowski would falsify the chart with his signature so it could be billed using Jankowski's Medicare Provider Identification Number. Therefore, all the services provided by Hamdan but billed as if provided by Jankowski were fraudulent. Jankowski received approximately $624,000 for medical procedures he claimed to have personally performed inside patients' homes.

viii.   *Jankowski Directs Employees to Make Threats*

Not one to take full responsibility himself, Jankowski dragged his own employees into his drug-trafficking empire. During trial, the court admitted Jankowski's text messages including one in which his Southfield Office Manager, Kristy Coleman, relayed that she received a  phone call from an angry individual

11

who reported that Jankowski's pill patient sold her Percocet to the individual's son. Coleman made sure Jankowski knew J.P. was an "auto patient."

Jankowski's first reaction was, "Is J.P. white or black?" He then directed Coleman to tell the man "that his son is going to be as guilty as J.P." Jankowski angrily exclaimed "False" when confronted with his own pertinent text message. (ECF No. 185, Jankowski Cross Trans., PgID 3102). Jankowski persisted in his false denial regarding patient J.P. when confronted by the absence of any record in her chart that Jankowski ever brought her in for a pill count or counseling as his own expert, Dr. Thomas Nabity, admitted would have been the appropriate course of action. (Id. at PgID 3103). He claimed -without any support in the patient file – that he engaged counseled patient J.P. and conducted a pill count. (*Id.* at PgID 3105).

His own text messages to Kristy Coleman illustrate the frightful degree of corruption at his multiple clinics. Running a medical clinic via text message, Jankowski quickly told his office manager "good job" after she told him she had discharged 5 patients with "bad quality patients" with positive results for cocaine, heroin. Coleman warned Jankowski that "we had quite a few crush up pills in their urine yesterday).(Insert exhibit 125 – crushed up pills). Jankowksi asked "When you [patient] crush pill… do you just send them out? Or have them discharged? Or redo?" Coleman responded: "Depends on the insurance and history of the patient.

12

If its auto or BCBS, I'll have her make them redrop [urine]. If they have a bad history of negatives we will discharge." To this sinister and sick plot line, Jankowski simply responded "Good job." He apparently made no effort to stop drug seeking patients from using his own practice as a honey pot for their own criminal conduct.

According to the Centers for Disease Control, prescription opioids continue to be involved in more overdose deaths than any other drug, and all the numbers are likely to underestimate the true burden given the large proportion of overdose deaths where the type of drug is not listed on the death certificate. The findings show that two distinct, but interconnected trends are driving America's opioid overdose epidemic: a 15-year increase in deaths from prescription opioid overdoses, and a recent surge in illicit opioid overdoses driven mainly by heroin and illegally-made fentanyl. By any objective measure, opioid abuse in this country is exacting an immeasurable toll. Medically unnecessary opioids prescribed using Jankowski's pre-signed prescriptions were diverted by A.B., J.A., A.M. and countless others for illicit use in our community and beyond. Opioid deaths in the state of Michigan exceeded 2,000 in 2018. More Michiganders die from drug overdoses – including opioid, fentanyl, and heroin – than car accidents.[4]

---

[4] https://www.michigan.gov/opioids/about-the-epidemic

Un-ironically, car accidents and a continuous flow of opioid pills was the very basis of Jankowski's scheme to enrich himself.

## II.     Sentencing Guidelines Calculations

The Government concurs with Probation Department's guidelines calculation placing Jankowski's guidelines at life imprisonment, which underscores the seriousness of Jankowski's prolific criminal conduct.  We submit that the PSR should remain as written in full. The United States will submit a response to Jankowski's PSR objections submitted on March 2, 2023, separately.

## III.     General Deterrence

### a.  Medicare Fraud Remains Acute Problem Locally

Any sentence imposed must deter other medical providers from committing health care fraud. The very fact that former United States Attorney Barbara McQuade was compelled to create an entire unit of her office dedicated to the prosecution of health care fraud and prescription drug diversion drives home the severity of the problem. Our office's health care fraud enforcement efforts are also augmented by a team of prosecutors from the Justice Department's Health Care Fraud Strike Force. The need for this combined effort demonstrates the rot that pervades our local health care industry. This sentence must send a message locally that this kind of graft and poison pushing will no longer be tolerated.

b. *Medicare Trust Fund Going Broke*

By any objective measure, the Medicare beneficiaries face the horrifying prospect that America's largest insurance program will go broke thereby depriving hundreds of millions of the healthcare promised to them and paid for by hard-working honest citizens. CNN reports the following: Medicare and Social Security insolvency is right around the corner.[5] In 2020 alone, CMS estimates that Medicare paid more than $25 billion in fraudulent claims. Although Medicare's precarious financial stability cannot be solely attributed to fraudsters like Jankowski, his greed does nothing but further undermine Medicare's solvency. Beyond the billions of dollars lost, a potentially more pernicious problem lurks. The late-federal Judge Arthur J. Tarnow once observed of health care fraudsters: the damage they reap goes beyond dollars lost; it serves to undermine trust in public institutions. Calculating the harm to folks who rely on Medicare and Medicaid caused by Jankowski and his ilk, therefore, is unfathomable.

The politically fraught issue of provisioning health care only further illustrates the vexing nature of this issue facing the American people and its leaders. Just today, President Biden outlined his plan to extend the life of Medicare for 25 years. His plan involves tax increases, which are rarely palatable regardless

---

[5] https://www.cnn.com/2023/02/09/politics/medicare-social-security-what-matters/index.html;

of one's perspective. *See Joe Biden: My Plan to Extend Medicare for Another Generation, New York Times Op-Ed, March 7, 2023.*[6]

### c. *No Fault Auto Insurance Remains Dicey Issue Statewide*

The Michigan legislature enacted amendments to the state's auto-insurance regime aimed at reducing auto insurance rates, which were the highest nationally, in 2020. When initially enacted the No Fault statutes were an attempt to reduce costs and litigation. In reality, unscrupulous players like Jankowski exploited the statute's requirement that auto insurances often thousands of dollars more than other insurers would pay for the same procedures. No fee schedule governed the medical procedures reimbursed by auto insurers; a burden ultimately carried by Michigan consumers. This state continues to be home to unspeakably pockets of poverty where health care is critically needed but sorely lacking. Every dollar Jankowski stole deprived this state's citizens of much needed health care resources. The Michigan Supreme Court continues to weigh the issue of whether auto insurance companies must continue to pay the same benefits to the most seriously injured car accident patients. And as this state's leaders weighed their options and as the working poor of our community made a choice between paying for food/shelter/clothing or for car insurance, Jankowski laughed all the way to the

---

[6] https://www.nytimes.com/2023/03/07/opinion/joe-biden-
Medicare.html?action=click&module=Well&pgtype=Homepage&section=Opinion

16

bank using his pre-signed prescription to keep the ship moving as his traveled abroad.

## IV.    Specific Deterrence

A sentence of 300 months' imprisonment is sufficient but not greater than necessary to specifically deter Jankowski from committing additional crimes.

## V.    Unwarranted Disparities

The United States respectfully submits that a sentence within in the guidelines range of 300 months will avoid any unwarranted national disparities in sentencing.

Such a sentence would fall in line with other sentences imposed for similarly situated defendants in the Eastern District of Michigan. Farid Fata received 45 years' imprisonment after admitting that he poisoned patients – who did not have cancer – with chemotherapy. (13-cr-20600, J. Borman). Pill mill operator Boris Zigmond, a chiropractor, whose admitted-conduct pales in comparison to Jankowski's received 15 years' imprisonment after pleading guilty to drug diversion and money laundering. (15-cr-20283, J. Steeh).

Three Jankowski-linked physicians have similarly received substantial prison sentences in the Eastern District of Michigan. Jankowski served as an assistant to orthopedic surgeon Aria Sabit who received 20 years' imprisonment after admitting to harming patients while committing health care fraud. (14-cr-

20779 & 15-cr-20311, J. Borman). Jankowski and Sabit were so close that border patrol records show that the two traveled to Afghanistan. Jankowski shared patients, and patient recruiters in-common with Hicham El-Horr, a physician who received 72 months' imprisonment after he admitted to defrauding Medicare of $4.2 million in a physician home visit scam. (13-cr-20158, Edmunds, J.). Jankowski emails reflect that Jankowski's staff discussed billing Medicare beneficiaries seen by Laran Lerner, a physician who pleaded guilty to distribution of controlled substances and health care fraud and received 45 months' in prison. (16-cr-13180, Roberts, J.)

Jankowski put it best himself on direct when he said, "If it looks like a duck and walks like a duck, it's usually a duck." He's drug dealer with a lab coat. This court should treat him no differently. To the contrary, unlike countless other defendants sentenced by this court, Jankowski seems to have every imaginable advantage in his life. He threw it all away because he was never satisfied. He has no one to blame but himself. Justice requires that this Court impose a 300-month sentence.

Respectfully submitted,

Dawn N. Ison
United States Attorney


s/Philip A. Ross
Philip A. Ross
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9790
Philip.Ross@usdoj.gov

Date: March 7, 2023

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was served upon defense counsel via ECF

on March 7, 2023.


 s/Philip A. Ross_____
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9790
Philip.Ross@usdoj.gov